UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| BME FIRE TRUCKS LLC, an Idaho limited liability company; and 223 ROEDEL AVENUE LLC,<br><br>    Plaintiffs,<br><br>v.<br><br>THE CINCINNATI CASUALTY COMPANY, an Ohio corporation,<br><br>    Defendant. | Case No. 1:23-cv-00321-AKB<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Plaintiffs, BME Fire Trucks LLC ("BME") and 223 Roedel Avenue LLC's ("Roedel"), brought this action against their insurer, Defendant The Cincinnati Casualty Company ("Cincinnati"), seeking damages caused by a ruptured natural gas pipeline. Pending before the Court are the parties' cross-motions for summary judgment (Dkts. 35, 40); Plaintiffs' motion to strike (Dkt. 67); Cincinnati's motion to dismiss (Dkt. 69); and seven motions for judicial notice (Dkts. 45, 58, 64, 70, 74, 78, and 79). Having reviewed the record and the parties' submissions, the Court finds that oral argument would not significantly aid its decision-making process, and it decides the motions on the parties' briefing. *See* Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B); Fed. R. Civ. P. 78(b) ("By rule or order, the court may provide for submitting and determining motions on briefs, without oral hearings.").

## BACKGROUND

BME manufactures wildland fire apparatuses at its facility at 4600 South Apple Street in Boise, Idaho (Dkt. 37 at ¶ 2). Roedel owns this property and leases it to BME (*id.* at ¶ 3). Chad Moffat is BME's president and managing member and Roedel's managing member (*id.* at ¶ 1).

Cincinnati issued a Commercial Property Policy No. EPP0550032, effective September 4, 2022, to September 4, 2023 ("Policy"). The Policy names both BME and Roedel as insureds (*id.* at ¶ 4; Dkt. 37-3 at 7). A Manufacturers' Commercial Property Endorsement amends the Policy to provide that underground pipes are covered property under the Policy (Dkt. 60-1 at 75, 80-81). The Policy's general framework provides for broad coverage unless excepted and has numerous broad exceptions. At issue here is whether the Policy's exclusions for "rust or other corrosion" and construction defects exclude coverage (Dkt. 44-1 at 33, 35).

Sometime before the rupture of the natural gas pipeline, which is at issue, BME detected a faint odor of gas on the property, discovered a minor leak in the pipeline, repaired the leak, and diverted traffic to another area (Dkt. 37 at ¶¶ 10-13). Then, October 24, 2022, BME employees noticed a "sudden" and "severe" odor of gas under the lane of diverted traffic, and a subsequent investigation revealed a severe rupture in the pipe (*id.* at ¶¶ 13-15). BME repaired the pipeline, and as part of this process, it was required to pressure test the pipeline at twice the normal pounds per square inch (*id.* at ¶ 16). This testing revealed "multiple pinhole leaks" throughout the system, requiring BME to replace the entire pipeline (*id.* at ¶ 17).

On October 31, 2022, BME submitted a claim to Cincinnati (*id.* at ¶ 18), and Cincinnati retained Brian Hansen of Northwest Investigative Engineering to inspect the property (Dkt. 43 at ¶ 2). On November 16, Hansen met with BME's facility technician, conducted an on-site inspection, and examined the pipeline (*id.* at 2). The following day, Hansen issued an engineering

report, in which he concluded a construction defect caused the pipe to corrode, resulting in the rupture (Dkt. 43 at 7).

Meanwhile, Plaintiffs' expert, Franco Massari, inspected the property on February 5, 2023, reviewed photographs, installation records, soil data, and Hansen's expert report, and then Massari issued his own expert report (Dkt. 52-1). He concluded that "the pipeline was initially installed using clean earth without stones or boulders" and that "based on the recent diversion of industrial traffic to the location, the impact of the traffic contributed to the failure of the carbon steel line due to stresses and the proximity of the rocks (*id*. at 4).

On February 13, 2023, Cincinnati sent BME a letter denying coverage and providing BME with a copy of Hansen's report (Dkt. 37-4). Cincinnati issued a supplemental denial on February 27, acknowledging the endorsement covering the pipeline but asserting that exclusions barred coverage (Dkt. 37-6). In an April 13 letter, Plaintiffs' counsel responded identifying both BME and Roedel as insureds, disputing Cincinnati's denial, and demanding reconsideration. The letter emphasized that heavy equipment traffic caused the rupture and that the cause was not subject to exclusion (Dkt. 37 ¶¶ 19-21; Dkt. 48-5).

Plaintiffs assert that Cincinnati did not substantively respond to this April 13 letter. In July 2023, BME brought this action (Dkt. 1). Later, BME amended its complaint to include Roedel as a plaintiff (Dkt. 60). Cincinnati moves to dismiss Plaintiffs' Third Amended Complaint (Dkt. 69), and the parties have filed cross-motions for summary judgment (Dkts. 35, 40), among other motions.

# ANALYSIS

## A. Motion to Dismiss

Both BME and Roedel allege four claims for relief in their Third Amended Complaint (Dkt. 60). These claims include a claim for declaratory judgment, for breach of contract, for breach of the duty of good faith and fair dealing, and for tortious bad faith. Cincinnati moves under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Roedel's claim for breach of contract and to dismiss Plaintiffs' claims for breach of the duty of good faith and fair dealing and for bad faith (Dkt. 69).

Although Plaintiffs separately allege claims for breach of the duty of good faith and fair dealing and for bad faith, Cincinnati makes no independent argument in support of its motion to dismiss Plaintiffs' claim for breach of the duty of good faith (*see generally* Dkt. 69). Rather, Cincinnati and Plaintiffs address the claims jointly. Because the parties treat the claims as synonymous, the Court does likewise. *See, e.g., Lambirth v. USAA Casualty Ins. Co.*, 667 F. Supp. 3d 1073, 1088 (D. Idaho 2023) ("An independent tort claim for breach of the implied covenant of good faith and fair dealing in the context of a first-party insurance action in Idaho, is considered a claim of bad faith.").

Additionally, both parties submit portions of Moffat's deposition transcript in support of their motion to dismiss briefing (*see* Dkts. 73, 77). Neither party, however, explains the purpose of submitting the transcript. Because the Court does not need to address Moffat's deposition testimony to resolve Cincinnati's motion to dismiss, it declines to consider the transcript. Moreover, considering the transcript would require the Court to convert Cincinnati's motion to dismiss into a summary judgment motion, which the Court declines to do. *See United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003) ("[I]f a district court considers evidence outside the

pleadings, it must normally convert the 12(b)(6) motion into a Rule 56 motion for summary judgment.").

### 1.  Legal Standard

Under Rule 12(b)(6), a motion to dismiss for failure to state a claim on which relief can be granted tests the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A dismissal under Rule 12(b)(6) is appropriate where a plaintiff fails to state a claim upon which relief can be granted. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a short and plain statement of the claim, showing the plaintiff is entitled to relief and giving the defendant fair notice of plaintiff's claim and the grounds upon which it rests. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although a complaint challenged by Rule 12(b)(6) motion to dismiss "does not need detailed factual allegations," it requires "more than labels and conclusions." *Twombly*, 550 U.S. at 555. "[A] formulaic recitation of the elements of a cause of action will not do." *Id.*

To survive a Rule 12(b)(6) motion, a claim requires a complaint to have enough factual basis which, if true, states a plausible claim for relief. *Twombly*, 550 U.S. at 556. A claim has facial plausibility when the plaintiff pleads factual content allowing the court to draw a reasonable inference the defendant is liable for the alleged misconduct. *Id.* The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility a defendant has acted unlawfully. *Id.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* at 557.

### 2. Breach of Contract

Cincinnati argues Roedel has failed to state a breach of contract claim. Insurance policies are contracts, and the parties' rights and obligations are primarily defined by the policy terms. *Lanningham v. Farm Bureau Mut. Ins. Co. of Idaho*, 551 P.3d 1251, 1254-55 (Idaho 2024). Both parties here rely on *Mosell Equities, LLC v. Berryhill & Co.*, 297 P.3d 232 (Idaho 2013), for the proposition that a cause of action for breach of an insurance contract includes four elements under Idaho law: (1) the existence of a contract; (2) the breach of that contract; (3) the breach caused damages; and (4) the amount of those damages (Dkt. 68 at 3; Dkt. 72 at 3). Accordingly, the Court addresses these elements.

As Plaintiffs note, Roedel has alleged each element of breach of contract (Dkt. 72 at 4). For example, the third amended complaint alleges that "the Policy is a valid and enforceable written contract of insurance" in effect at relevant times; Cincinnati is "obligated" under the Policy; Roedel is a named insured under the Policy; Cincinnati "has refused to provide coverage" under the Policy; Roedel "has suffered and continues to suffer damages"; and Roedel's damages include, without limitation, "costs to repair and replace" the pipeline (Dkt. 60 at 8-9).

Cincinnati, however, does not challenge Roedel's failure to allege any of the elements of breach of contract. Rather, it argues that Roedel has never alleged that it "submitted a claim to Cincinnati for its alleged losses arising out of the failure of the natural gas line" (Dkt. 68 at 3). Cincinnati, however, cites no authority that Roedel must specifically plead it submitted a "claim." Roedel does allege, however, that "Plaintiffs are, and at all relevant times were, in compliance with all conditions precedent to coverage under the Policy" and "Plaintiffs performed all conditions and covenants under the Policy. . . ." (Dkt. 60 at 8-9, ¶ 5). Although Roedel does not directly allege it submitted a claim, its allegations are adequate to give Cincinnati notice of Roedel's breach of

contract claim and of the grounds on which that claim rests. *See Twombly*, 550 U.S at 555 (noting Rule 8(a)(2) requires only a short and plain statement of the claim, showing plaintiff is entitled to relief and giving defendant fair notice of plaintiff's claim and grounds on which it rests).

### 3. Bad Faith

Cincinnati argues Plaintiffs have failed to state a bad faith claim. A bad faith claim arises when an insurer unreasonably and in bad faith withholds benefits due under the policy. *White v. Unigard Mut. Ins. Co.*, 730 P.2d 1014, 1016-17 (Idaho 1986). To state a claim for bad faith, a plaintiff must allege that: (1) the insurer intentionally and unreasonably denied or withheld payment; (2) the claim was not fairly debatable; (3) the denial or failure to pay was not the result of a good faith mistake; and (4) the resulting harm is not fully compensable by contract damages. *Robinson v. State Farm Mut. Auto. Ins. Co*., 45 P.3d 829, 832 (Idaho 2002).

In support of Plaintiffs' bad faith claim, Plaintiffs allege that Cincinnati "unreasonably den[ied] and delay[ed] payment due and owing under the Policy"; this conduct was "intentional" and "not the result of a good faith mistake"; and "[c]overage for [their] losses under the Policy is not fairly debatable" (Dkt. 60 at 11-12). Cincinnati challenges these allegations as insufficient to state a bad faith claim because Plaintiffs did not allege the last element—that the resulting harm is not fully compensable by contract damages. Specifically, Cincinnati asserts that the Policy limits are "in excess of $25 million" and that "there are _no_ allegations [that Plaintiffs'] contractual damages are anywhere close to that amount" (Dkt. 8 at 5).

In other words, Cincinnati argues Plaintiffs may not assert a bad faith claim because they have not alleged they are underinsured. This argument misunderstands Idaho law. Under Idaho law, a bad faith claim requires a showing that Plaintiffs' damages are not compensable by contract, which is different than being underinsured. For example, a plaintiff's ability to recover tort

damages underpins Idaho's adoption of the bad faith claim against an insurer. *White.*, 730 P.2d at 1018 ("Thus, an insured person whose business goes bust as a result of an insurer's bad faith would be able to recover whether the bust was foreseeable or not.").

Here, Plaintiffs allege that their damages include "out-of-pocket expenses, lost profits and future earnings, consequential economic harm, and compensatory damages, in an amount of at least $1,000,000" (Dkt. 60 at 12). "Out of pocket" expenses commonly refer to non-insured costs related to the event and the recoverability of consequential damages in Idaho often turns on the parties' expectations at the time of contracting, not solely on the contract's language. Because Plaintiffs have alleged losses which are not likely compensable under the Policy, they have adequately stated a claim for relief for bad faith.

## B. Evidentiary Issues

Both parties raise numerous evidentiary issues in their summary judgment briefing and related filings. These challenges include Cincinnati's evidentiary objections to Plaintiffs' statement of facts; Plaintiffs' assertion that Hansen's expert opinions are inadmissible; a motion to strike Moffat's deposition testimony, which Cincinnati submitted on reply; numerous requests for judicial notice; and suggestions of spoliation. As an initial matter, the Court addresses these issues to determine what evidence it may consider on summary judgment.

### 1. Cincinnati's Objections to Plaintiffs' Statement of Undisputed Facts

Cincinnati raises numerous objections to Plaintiffs' statement of undisputed facts in support of their summary judgment motion (Dkt. 39, 57). Plaintiffs then reply to Cincinnati's objections with evidentiary arguments (Dkt. 57). Neither of these filings are proper.

The Local Rules for the District of Idaho provide that a party moving for summary judgment must submit a statement of undisputed facts and that a responding party must submit a

statement of disputed facts. Dist. Idaho Loc. Civ. R. 7.1(b)(1), (c)(2). The parties' statements of fact are not evidence, however. *See Sernoffsky v. Novak*, 773 F. Supp. 3d 988, 999 (S.D. Ca. 2025) ("A party's separate statement of undisputed material facts is not evidence."). Rather, they are "a tool designed to assist [the Court] with determining whether the moving party has met their burden." *Id.* At summary judgment, courts rely on the underlying evidence, not the statements contained within the statement of undisputed material facts. *Id.*

Nevertheless, contrary to Local Rule 7.1(c)(2), Cincinnati did not submit a statement of disputed facts in response to Plaintiffs' statement of undisputed facts. Instead, Cincinnati submitted "objections" to Plaintiffs' factual assertions (Dkt. 57). These objections include, for example, "irrelevant," "lacks foundation," "vague and ambiguous," "speaks for itself," "misstates" testimony, and "compound" (*id.*). Such evidentiary objections are inappropriate at the summary judgment stage. *Sernoffsky*, 773 F. Supp. 3d at 999. The objections are boilerplate, devoid of any specific analysis, and do not serve any meaningful purpose—such as avoiding jury confusion. *Id.* For these reasons, the Court overrules Cincinnati's objections.

### 2. Plaintiffs' Rule 702 Objection to Cincinnati's Expert, Hansen

Throughout Plaintiffs' summary judgment briefing and related filings, Plaintiffs challenge the admissibility of Hansen's expert opinions. These challenges include that Hansen is not qualified; he did not base his opinions on sufficient facts; he fails to explain his method; and he opines on a legal conclusion (*see, e.g.*, Dkt. 36 at 17-18; Dkt. 50 at 8, 11-12; Dkt. 51 at 2-5; Dkt. 65 at 5-8).

Rule 702 of the Federal Rules of Evidence governs and limits the admissibility of expert testimony in two ways. First, Rule 702 only permits witnesses with special "knowledge, skill, experience, training, or education" to testify as experts. Second, Rule 702 limits a qualified

expert's testimony to that which "will help the trier of fact to understand the evidence or to determine a fact in issue"; is based on "sufficient facts or data"; is "the product of reliable principles and methods"; and is "reliably applied" to the facts of the case. Fed. R. Evid. 702(a)-(d).

The Ninth Circuit has summarized Rule 702's requirements as follows: "expert testimony must (1) address an issue beyond the common knowledge of the average layman, (2) be presented by a witness having sufficient expertise, and (3) assert a reasonable opinion given the state of the pertinent art or scientific knowledge." *United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001) (citing *United States v. Morales*, 108 F.3d 1031, 1038 (9th Cir. 1997)). District courts have broad discretion in applying this test. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999).

The district court's role in applying Rule 702 is to be a gatekeeper. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). In that role, the court considers both the relevance and reliability of the proffered evidence. *Kumho*, 526 U.S. at 141. "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (citation omitted); *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022). Rule 702 clarifies the proponent of expert testimony must meet all of Rule 702's substantive standards for admissibility by a preponderance of evidence. *See* Fed. R. Evid. 702, advisory committee's note to 2023 amendment.

The Court disagrees that Hansen's opinions are inadmissible. The record reflects Hansen is qualified as an expert for purposes of opining on the issues in this case. For example, according to Hansen's curriculum vitae, he has a Bachelor of Science degree in mechanical engineering from Brigham Young University and is a registered professional engineer in eight states, including Idaho

(Dkt. 56-1 at 2). During his deposition, he testified that he has had an Idaho professional engineering license since 1999; he has been retained thousands of times to investigate insurance claims; and he has practical experience involving utilities from his practice as a mechanical engineer and his prior work experience with Zilog where he was "in charge of chemical delivery [and] specialty gas delivery systems" (Dkt. 38-1 at 14, 19-21, 23).

Further, the Court finds Hansen's opinions are supported by sufficient facts and data and the product of a reliable method. According to Hansen's report, he conducted an on-site inspection, interviewed the facilities technician, examined the ruptured pipe and the trench in which it was located, and took photographs (Dkt. 43 at 6-7). Based on his investigation, he concluded that a construction defect occurred:

> [T]he piping was buried in native fill which contains stones and rocks. These stones and rocks have damaged the outer felt covering which is intended to protect the piping from corrosion. Due to the damage to the pipe wrap, moisture was able to contact the piping which resulted in corrosion. Eventually, this corrosion led to the leak in the piping. Based on the size of the hole in the piping and the extent of the surrounding corrosion, it is more likely than not that the piping was leaking for a long period of time before being discovered

(Dkt. 43 at 7). Hansen also noted he agreed that "the heavy equipment driving over the area may have exacerbated the condition" (*id.*).[1]

Additionally, the Court rejects Plaintiffs' assertion that Hansen's reliance on the Uniform Plumbing Code (UPC) and the National Fire Protection Association standards (*see, e.g.,* Dkt. 56 at 2), is inadmissible "legal analysis" (Dkt. 65 at 8). In support of this argument, Plaintiffs rely on

---

[1]    The Court rejects Plaintiffs' assertion that Hansen's opinions are not based on sufficient facts because "he did not know that the smell of gas at the Property was severe and occurred suddenly" and that the "traffic had recently been diverted to the location" (Dkt. 50 at 12). Contrary to this assertion, Hansen considers the heavy traffic in his report (Dkt. 43 at 7). Regardless, Plaintiffs may cross-examine on these facts.

*Nationwide Transport Finance v. Cass Info. Sys., Inc.*, 523 F.3d 1051 (9th Cir. 2008). In that case, the district court excluded an expert's testimony regarding a party's obligation to follow a provision of the Uniform Commercial Code. *Id.* at 1058. The Ninth Circuit affirmed, ruling that an expert cannot give an opinion regarding a legal conclusion and that "instructing the jury as to the applicable law is the distinct and exclusive province of the court." Importantly, however, the Ninth Circuit noted "the district court allowed [the expert] to discuss industry conditions, standards, and practices." *Id.* (cleaned up).

Unlike the expert in *Nationwide*, Hansen's opinions do not address substantive legal issues. For example, he is not opining on how to interpret the Policy's language. Rather, he is opining on the applicable industry standards for burying a gas pipeline, which is not a matter of substance law nor an issue this Court can rule on as a matter of law. As the Ninth Circuit's opinion in *Nationwide* indicates, experts may opine on industry standards. *Id.; see also De Freitas v. Hertz Corp.*, No. 2:18-cv-01522-JAD-BNW, 2023 WL 3505498, at *5 (D. Nev. May 17, 2023) (concluding expert qualified to testify about industry standard). For these reasons, the Court declines to rule that Hansen's opinions are inadmissible.

### 3. Motion to Strike

As discussed below, Cincinnati moves for summary judgment, arguing that a construction defect, namely that the pipe was buried in rocks, caused the pipe's rupture (*see, e.g.*, Dkt. 41 at 12 ("The precipitating event was irrefutably the improper installation of the gas line in native soil, which consisted of rocks, stone and other material."). Meanwhile, Plaintiffs dispute the pipe was buried in rocks and contend it was "installed using clean earth without stones or boulders" (Dkt. 52-1 at 5-6). On reply in support of its summary judgment motion, Cincinnati submits the transcript from Moffat's deposition where he testifies that the "fill dirt" contained "large rocks"

(Dkt. 63-1 at 64-65). Plaintiffs move to strike Cincinnati's reliance on Moffat's testimony and its related argument, arguing that Cincinnati improperly submitted this information on reply (Dkt. 67).

Rule 7.1(b)(2) of the District of Idaho Local Rules provides that "the moving party must serve and file with the motion affidavits . . . declarations . . . copies of all photographs, documentary evidence and other supporting materials on which the moving party intends to rely." Similarly, Rule 6 of the Federal Rules of Civil Procedure requires that "any affidavit supporting a motion must be served with the motion." Fed. R. Civ. P. 6(c)(2). Where an affidavit supporting a response is untimely, it may be stricken. *Herrera v. State of Idaho*, No. CV 02-358-S-MHW, 2005 WL 2367540, at *2 (D. Idaho Sept. 27, 2005). Generally, a court will not consider new evidence in a reply without first giving the non-movant an opportunity to respond. *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996). Courts may consider evidence rebutting arguments raised for the first time in the non-movant's opposition. *Mintun v. Peterson*, No. CV06-447-S-BLW, 2010 WL 1338148, at *27 (D. Idaho Mar. 30, 2010).

Contrary to Plaintiffs' assertion, Cincinnati did not raise Moffat's observation that the "fill dirt" contained "large rocks" for the first time on reply. Rather, Cincinnati submitted Moffat's email stating this observation in support of its summary judgment motion (Dkt. 44-4 at 2) ("They backfilled the lines with fill dirt containing large rocks. . . ."). Regardless, the Court does not need to consider Moffat's observation or testimony about large rocks for purposes of determining there is a disputed factual issue about whether the pipe was buried in soil containing rocks, stones, or other materials. As discussed below, the parties' competing expert opinions highlight this disputed factual issue.  For these reasons, the Court denies Plaintiffs' motion to strike.

### 4. Judicial Notice

Cincinnati has filed six Requests for Judicial Notice (Dkts. 45, 58, 64, 70, 78, 79). Oddly, each request seeks judicial notice of documents already filed in the record in this case. For example, Cincinnati requests judicial notice of BME's second amended complaint and repeatedly requests judicial notice of its own summary judgment filings (*see id.*). Meanwhile—and even more odd—Plaintiffs request the Court take judicial notice of a blank federal court form document intended to assist a pro se plaintiff in alleging a breach of contract claim (Dkts. 74, 74-1) (attaching Pro Se 4 (Rev. 12/16) Complaint of a Civil Case Alleging Breach of Contract). Other than citing Rule 201 of the Federal Rules of Evidence, neither party offers any explanation why the Court should take judicial notice as requested.

Rule 201 governs judicial notice of adjudicative facts. Under Rule 201, "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The party requesting judicial notice bears the burden of showing "the particular fact is not reasonably subject to dispute and is capable of immediate and accurate determination by resort to a source whose accuracy cannot reasonably be questioned." *Newman v. San Joaquin Delta Cmty. College Dist.*, 272 F.R.D. 505, 516 (E.D. Cal. 2011) (internal quotation marks and citation omitted); *see also Ritchie*, 342 F.3d 903 (discussing judicial notice).

Cincinnati offers no explanation why this Court should judicially notice filings already in this case's record. The Court does not need to take judicial notice of its own record, and Cincinnati cites no authority to the contrary. Moreover, none of the documents Cincinnati seeks to be

judicially noticed are facts which are not subject to reasonable dispute. Rather, they allege facts and argue law which the parties are disputing.

In contrast, the document for which Plaintiffs seek judicial notice—the federal court's formally adopted pro se form for a breach of contract case—might be a fact not subject to reasonable dispute. Regardless, Plaintiffs offer no explanation, and the Court is unable to conceive of one, for judicially noticing a blank, pro se form document in this case. Accordingly, the Court denies the parties' multiple requests for judicial notice.

### 5. Spoliation

Plaintiffs contend that Cincinnati's expert, Hansen, "impermissibly discarded approximately six feet of the pipe" and that as a result, Plaintiffs' expert, Massari, was only "able to thoroughly analyze the approximately two feet of pipe that remained" (Dkt. 50 at 9-10). In a footnote, Plaintiffs argue they are "entitled to a presumption that the 6 feet of pipe destroyed by [Hansen] would have been favorable to [Plaintiffs'] position and adverse to Cincinnati's" (*id.* at 10 n.1). Cincinnati responds that BME discarded "hundreds of feet of pipe," suggesting it likewise spoliated evidence (Dkt. 62 at 5 n.2). Because neither party addresses and analyzes the applicable law for determining evidentiary presumptions for spoliation or otherwise fleshes out this issue, the Court declines to rule on it.

## C. Summary Judgment

The parties filed cross-motions for summary judgment. Plaintiffs move for summary judgment on their claims for breach of contract and declaratory judgment, arguing that the Policy provides for coverage and on Cincinnati's fourth, fifth, and sixth affirmative defenses which seek to avoid coverage. Meanwhile, Cincinnati moves for summary judgment, arguing the Policy does not provide for coverage, a fact which would resolve all Plaintiffs' claims in Cincinnati's favor.

### 1.  Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The trial court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). In considering a motion for summary judgment, the court must "view[] the facts in the non-moving party's favor." *Id.* To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in the respondent's favor." *Id.* (citation omitted).

The trial court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather, the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that precludes summary judgment. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

Rule 56 requires the moving party to support its factual assertions by citing record materials including, for example, affidavits and declarations. Fed. R. Civ. P. 56(c)(1)(A). The responding party "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). A court, however, considers evidence which would be admissible at trial, even if the form of evidence on summary judgment

is not admissible. *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001) (explaining "a party does not necessarily have to produce evidence in a form that would be admissible at trial" for summary judgment purposes). At summary judgment, the court's role is not to weigh the competing expert opinions or to assess witness credibility; the court determines whether the evidence creates a genuine issue for trial. *Zetwick*, 850 F.3d at 441.

### 2.  Cross-Motions for Summary Judgment

Resolution of the parties' cross-summary judgment motions turns on factual causation issues. The parties offer differing theories of causation, which highlight at least one genuine issue of material fact precluding summary judgment. That fact is whether the pipe was installed using "fill dirt" that was free of rocks, stones, or other materials. The parties offer competing expert witness opinions on this disputed fact, among others.

### a.  Parties' Differing Causation Theories

Plaintiffs move for summary judgment, arguing that the pipe is covered property[2] and that its rupture is "accidental physical damage," which is a covered loss (Dkt. 36 at 13). In support, Plaintiffs offer a simple theory of causation. They argue that "the undisputed evidence overwhelmingly shows that the Loss occurred because a rock was pressed down into the Pipe by recently diverted traffic" (*id.* at 14). In other words, vehicles driving over the pipe caused its accidental rupture, which is a covered loss. They claim Cincinnati's expert witness, Hansen, "directly supports this conclusion by agreeing [that] the heavy equipment driving over the area may has exacerbated the condition" (*id.*) (cleaned up).

---

[2]    The parties do not dispute that the pipe is an underground pipe for which the Policy provides coverage under a Manufacturers' Commercial Property Endorsement which excepts underground pipes from exclusion of the Policy's "property not covered" (*compare* Dkt. 44-1 at 29 (§A.2.n) *with* Dkt. 60-1 at 81-82 (§ G(1)(b), (3))).

MEMORANDUM DECISION AND ORDER - 17

In contrast, Cincinnati argues that "the precipitating event was irrefutably the improper installation of the gas line in native soil, which consisted of rocks, stone and other material" (Dkt. 41 at 12). It characterizes this "improper installation" as a construction defect. Under Cincinnati's causation theory, "the negligent installation of the pipe in compromised soil caused the rock impingement, which in turn, caused the felt wrap to deteriorate, thus allowing moisture to corrode the exterior of the pipe and ultimately result[ing] in a leak" (*id.* at 13). In support of this theory, Cincinnati submits Hansen's expert report which, as previously noted, opines that "the piping was buried in native fill which contains stones and rocks. These stones and rocks have damaged the outer felt covering which is intended to protect the piping from corrosion. Due to the damage to the pipe wrap, moisture was able to contact the piping which resulted in corrosion" (Dkt. 43 at 7).

Under Cincinnati's explanation of causation, the Policy does not provide coverage for Plaintiffs' loss. The Policy excludes construction defects from coverage: "We will not pay for 'loss' caused by or resulting from the following . . . defects, errors, and omissions," including "[a]n act, error, or omission (negligent or not) relating to . . . "[d]esign, specification, construction, [or] workmanship. . . ." (Dkt. 44-1 at 35) (§A(3)(c)(1)(b)). Cincinnati concedes this exclusion is subject to an exception, which provides that "if an excluded cause of loss" "results in a Covered Cause of loss" the Policy will pay that portion of the loss (*id.*) (§A(3)(b)(3)). Cincinnati, however, argues this exception is inapplicable because "the negligent installation of the pipe resulted in its corrosion and deterioration that ultimately caused the leak" and corrosion is an excluded cause (Dkt. 41 at 13) (discussing §A(3)). Specifically, the policy provides that "we will not pay for 'loss' caused by or resulting from any of the following . . . wear and tear [or] rust or other corrosion. . . ." (Dkt. 44-

1 at 33 (§A(3)(b)(2)(d)(1), (2))). In other words, according to Cincinnati, the construction defect caused rust and corrosion, which is not a covered loss.

Plaintiffs do not directly dispute Cincinnati's application of the Policy under its theory of causation. Rather, they dispute that causation theory. Plaintiffs argue Cincinnati cannot show a construction defect caused the pipe's rupture because Hansen cannot support his opinion that the UPC, which "requires piping be buried 'with clean earth,'" applies to determine a construction defect (Dkt. 35 at 15). Further, Plaintiffs argue that regardless of the UPC's application, Cincinnati cannot show the pipe "was initially installed in fill dirt containing stones or rocks" (*id.* at 17). In support, Plaintiffs submit Massari's expert report which states, among other things, that "the pipe was initially installed using clean earth without stones or boulders" (Dkt. 52-1 at 5-6).

By disputing the facts underlying Cincinnati's causation theory, Plaintiffs concede they are not entitled to summary judgment. Specifically, they acknowledge that "issues of material fact exist concerning Cincinnati's assertion that the Pipe was buried in fill containing rock and stones" (Dkt. 50 at 8). To the contrary, Cincinnati asserts there is no factual dispute about whether the pipe was installed in soil containing rocks and stones. Specifically, Cincinnati argues that "Moffat and Hansen agree, and *Massari does not disagree*, that the damaged pipeline was originally installed in improper soil" (Dkt. 62 at 8) (emphasis added). This argument, however, misrepresents Massari's opinion. His report expressly states that "the pipe was initially installed using clean earth without stones or boulders" (Dkt. 52-1 at 4). This disagreement among witnesses about the soil in which the pipe was buried creates a disputed factual issue for trial.

### b. Applicable Legal Doctrine

In addition to disputing factual issues, the parties also dispute the applicable legal doctrine for determining coverage where there are multiple possible causes of a loss. The Idaho Supreme

Court addressed this issue in *ABK, LLC v. Mid-Century Ins. Co.*, 454 P.3d 1175 (Idaho 2019). In that case, ABK submitted a claim to its insurer, Mid-Century, after water infiltrated ABK's underground storage tanks. *Id.* at 1178. Mid-Century denied the claim, asserting that the policy excluded ABK's damages. *Id.* at 1179. On summary judgment, the district court noted multiple possible causes for the damage, including "inadequate maintenance," "wear and tear," and "water and weather conditions." *Id.*; *see also id.* at 1180 ("[T]he district court recognized there could be more than one cause of the damage."). Nevertheless, the court concluded that surface water was one undisputed cause of ABK's loss; based on this cause, ABK's damages were barred from coverage under the policy's water exclusion; and as a result, Mid-Century was entitled to summary judgment. *Id.* at 1179-80.

The district court in *ABK* based its decision on the anti-concurrent causation clause in the water exclusion. This clause provided that the exclusion applied "regardless of any other cause or event that contributes concurrently or in any sequence to the loss." *Id.* at 1181 (cleaned up). As the Idaho Supreme Court explained, "[a]n anti-concurrent causation clause . . . states that where a property loss is caused by a combination of excluded and covered perils, the entire loss is excluded from coverage," *id.* at 1182 n.3, and "when [an] anti-concurrent causation [clause] is used in an insurance policy, an insurer need only show an excluded cause is *a* cause of the damage, not *the only or the sole* clause." *Id.* at 1182. Because water was an undisputed cause of ABK's damages and because the water exclusion provision contained an anti-concurrent causation clause, the Court affirmed the district court's grant of summary judgment for Mid-Century.

After concluding the anti-concurrent causation clause controlled, the Idaho Supreme Court rejected ABK's argument that the district court should have analyzed the efficient proximate cause, explaining that "the parties contracted out of its application." *Id.* at 1184; *see Ward v. Safeco Ins.*

*Co. of Am.*, 58 F.4th 1301, 1303 (9th Cir. 2023) ("In interpreting the law of states with an [efficient proximate cause] doctrine, some courts have found that parties are free to contract around its application."); *Pioneer Chlor Alkali Co. v. Nat'l Union First Ins. Co. of Pittsburgh*, 863 F. Supp. 1226, 1232 (D. Nev. 1994) ("The efficient proximate cause doctrine is a default rule which gives way to the language of the contract.") (citing cases).

Although the Idaho Supreme Court did not apply the efficient proximate cause doctrine in *ABK*, it noted the doctrine is "the universal method for resolving coverage issues involving the concurrence of covered and excluded perils." *Id.* at 1185 (quoting *W. Nat. Mut. Ins. Co. v. Univ. of N.D.*, 643 N.W.2d 4, 12 (N.D. 2002). The Court also noted a split in authority regarding the doctrine's application. In some jurisdictions, coverage turns on "the cause setting the chain of events in motion [and] is the cause to which the loss is attributed." *Id.* at 1185 (cleaned up) (quoting *C.P. ex rel. M.L. v. Allstate Ins. Co.*, 996 P.2d 1216, 1228 (Alaska 2000)). Meanwhile, in other jurisdictions, coverage is determined by "the predominant cause, rather than the cause which is first in time." *Id.*

### c.  The Efficient Proximate Cause Doctrine

Cincinnati relies on Washington state law to define the version of the efficient proximate cause doctrine it contends is applicable here.[3] Specifically, it cites *Hill & Stout, PLLC v. Mut. of Enumclaw Ins. Co.*, 515 P.3d 525 (Wash. 2022) (en banc). In that case, the Washington Supreme

---

[3]    According to Cincinnati, "Idaho law construes policies in the same manner as does Washington law" (Dkt. 55 at 9 n. 3). In support of this proposition, Cincinnati cites *Country Mutual Ins. Co. v. Jackson*, No. 2:20-cv-00150-SAB, 2022 WL 187808, at *5 (E.D. Wash. Jan. 20, 2022). The court in *Country Mutual*, however, did not conclude Idaho and Washington law are the same; rather, it concluded that "to the extent there is a conflict with respect to the states' adoption of the doctrine of efficient proximate cause, the Court need not perform an efficient cause analysis. . . ." *Id.*

Court addressed whether an insurance policy covered lost business income caused by a proclamation prohibiting nonemergency dental care during the COVID-19 pandemic. *Id.* at 528. The Court ruled that the policy's coverage of "direct physical loss of or damage to property" did not cover the plaintiffs' lost business income, and it concluded that it did not "need [to] reach . . . the issue of efficient proximate cause." *Id.*

Nonetheless, in dicta, the Washington Supreme Court discussed the efficient proximate cause doctrine and described it as applying "to mandate coverage when an initial covered peril sets a causal chain in motion and that causal chain includes later excluded perils. It does not apply to mandate coverage when an initial *uncovered* peril sets a causal chain in motion that includes covered and/or uncovered losses." *Id.* at 535. In other words, the Court concluded that the efficient proximate cause is "the cause that triggers other causes to result in a loss." *Id.* (citing *Findlay v. United Pac. Ins. Co.*, 917 P.2d 116, 122 (Wash. 1996)).

Meanwhile, Plaintiffs argue that "Idaho has never adopted the 'efficient proximate cause' doctrine despite the Idaho Supreme Court's decision in *ABK* (Dkt. 65 at 4). Instead, Plaintiffs argue that under Idaho law "an exclusion will not bar coverage for an insured's loss if covered and excluded causes both contributed to cause," unless clear policy language indicates otherwise (Dkt. 65 at 4). Plaintiffs repeatedly describe this doctrine as the "concurrent causation doctrine" (Dkt. 50 at 2; *see also id.* at 3 ("[T]he concurrent causation doctrine dictates that where, as here, the policy does not contain anti-concurrent language, a claim is covered if it is caused concurrently by covered (heavy industrial traffic) and uncovered (rust, corrosion, or construction defect) cause."); *id.* at 14 ("[T]he concurrent causation doctrine dictates that the loss is covered.")).

Plaintiffs cite *ABK*, 454 P.3d at 1184 and *Engineered Structures, Inc. v. Travelers Prop. Cas. Co. of Amer.*, 822 F. App'x 606 (9th Cir. 2020) (citing *ABK*), in support of their assertion the

"concurrent causation doctrine" is the applicable doctrine under Idaho law (Dkt. 65 at 4-5). Neither *ABK* nor *Engineered Structures*, however, adopts a "concurrent causation" doctrine. Indeed, neither case discusses such a doctrine nor even uses the phrase "concurrent causation."

While Plaintiffs are correct that the Idaho Supreme Court in *ABK* does not apply the efficient proximate cause doctrine, this Court disagrees that Idaho would not adopt that doctrine. Rather, this Court predicts the Idaho Supreme Court would adopt and apply the doctrine. *All. for Prop. Rts. & Fiscal Resp. v. City of Idaho Falls*, 742 F.3d 1100, 1102 (9th Cir. 2013) ("When the state's highest court has not squarely addressed an issue," the court "must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises and restatements for guidance."). Indeed, the *ABK* Court recognized the efficient proximate cause doctrine as "the universal method for resolving coverage issues involving the concurrence of covered and excluded perils." *ABK*, 454 P.3d at 1185 (quotations omitted).

Further, this Court predicts the Idaho Supreme Court would adopt that version of the efficient proximate cause doctrine which focuses on the predominant cause rather than the cause which triggered other causes resulting in the loss. In support of this conclusion, this Court notes the *ABK* Court cited *Western Nat. Mut. Ins. Co. v. U. of North Dakota*, 643 N.W.2d 4 (N.D. 2002). In that case, the North Dakota Supreme Court cited with approval the trial court's jury instruction which adopted the predominant cause version of the efficient proximate cause doctrine. That instruction provided:

> The efficient proximate cause is a peril or risk that sets other cause in motion. It is not necessarily the last act in a chain of events, nor necessarily is it the triggering cause. To determine the efficient proximate cause you must look to the quality of the links and the chain of causation.

**MEMORANDUM DECISION AND ORDER - 23**

> The efficient proximate cause is considered the predominating cause of the loss. By definition there can only be one efficient proximate cause; i.e., predominant cause of the loss.

*Id.* at 14.

Applying the predominant-factor version of the efficient proximate cause doctrine, the Court concludes genuine issues of material fact preclude summary judgment for either party on any claims or affirmative defenses regarding the Policy's coverage. The cause of the pipe's rupture, including whether it was defectively installed in soil containing rocks, stones, and other materials, is a disputed issue for trial. Indeed, this issue is highlighted by the parties' contradictory expert opinions.

Cincinnati is entitled, however, to summary judgment on Plaintiffs' bad faith claim. To prevail on their bad faith claim, Plaintiffs must show that coverage under the Policy was "not fairly debatable." *See Anderson v. Farmers Ins. Co. of Idaho,* 947 P.2d 1003, 1007 (1997) (affirming summary judgment on bad faith claim where no evidence that claim was "not fairly debatable" was presented). In Idaho, "fairly debatable" means that "at the time [the] claim was under consideration, there existed a legitimate question or difference of opinion over the eligibility, amount or value of the claim." *Robinson*, 45 P.3d at 833-34.

As discussed above, the state of Idaho law on the efficient proximate cause doctrine was fairly debatable. Further, whether the predominant cause of the pipe's failure was vehicular traffic, a construction defect, rust, or corrosion is debatable. Even after much litigation and expert disclosures, a genuine dispute exists regarding what caused the failure, and the Policy's coverage turns on what caused the failure. Because Plaintiffs are unable to show that their claim is "not fairly debatable," Cincinnati is entitled to summary judgment on Plaintiffs' bad faith claim.

**MEMORANDUM DECISION AND ORDER - 24**

## ORDER

For the reasons stated above, IT IS ORDERED:

1.  Plaintiffs' Motion for Summary Judgment (Dkt. 35) is **DENIED**.

2.  Defendant's Motion for Summary Judgment (Dkt. 40) is **DENIED** in part and **GRANTED** in part. The Court grants Defendant summary judgment on Plaintiffs' bad faith claim.

3.  Plaintiffs' Motion to Strike (Dkt. 67) is **DENIED**.

4.  Defendant's Motion to Dismiss (Dkt. 69) is **DENIED**.

5.  The parties' Motions for Judicial Notice (Dkts. 45, 58, 64, 70, 74, 78, and 79) are **DENIED**.

DATED: December 01, 2025

Amanda K. Brailsford
U.S. District Court Judge